Thomas M. ROSS, Jr., Plaintiff,

v.

The EMPLOYERS' LIABILITY ASSURANCE CORPORATION, Ltd., Defendant.

No. EC 6646–K.

United States District Court
N. D. Mississippi,
E. D.

Sept. 24, 1968.

**570**

J. Hoy Hathorn, Louisville, Miss., Lumpkin, Holland & Ray, Tupelo, Miss., for plaintiff.

William E. Suddath, Jr., Jackson, Miss., for defendant.

## OPINION OF THE COURT

KEADY, Chief Judge.

In this case of insurance law novelty, plaintiff has sued for a loss of $26,355.59 allegedly sustained as a direct result of loss or damage to his records of accounts receivable insured under a policy issued by defendant covering all risk of loss of or damage to the insured's records of accounts receivable. Defendant denied liability, asserting that from the date of the casualty, plaintiff had demanded a sum equal to the total of all accounts receivable, less sums actually collected, without reference to charge-off for bad debts, reestablishment of accounts from other records, and failure to make diligent effort to collect still other accounts, as required by the terms of the policy. The issues were submitted to the court without a jury and at the conclusion of the case, findings of fact and conclusions of law, in accordance with those herein set forth, were announced from the bench and plaintiff was awarded a decree of $13,239.35.

Defendant's policy insured against all risk of loss or damage to "the insured's records of accounts receivable" the following:

> "(a) All sums due the Insured from customers, provided the Insured is unable to effect collection thereof as the direct result of loss of or damage to records of accounts receivable;
>
> (b) Interest charges on any loan to offset impaired collections pending repayment of such sums made uncollectible by such loss or damage;
>
> (c) Collection expense in excess of normal collection cost and made necessary because of such loss or damage;
>
> (d) Other expenses, when reasonably incurred by the Insured in re-establishing records of accounts receivable following such loss or damage."

The policy also provides the following:

> "There shall be deducted from the total amount of accounts receivable, however established, the amount of such accounts evidenced by records not lost or damaged, or otherwise established or collected by the Insured, and an amount to allow for probable bad debts which would normally have been uncollectible by the Insured.  *  *  *"

## FINDINGS OF FACT

Plaintiff, Thomas M. Ross, Jr., at all pertinent times, was the owner and operator of a feed mill business at Louisville, Mississippi, known as Quality Feed Mill. It was a sole proprietorship. His business consisted of selling, grinding, and mixing livestock and poultry feed, and dealing in similar feedstuff. The business was conducted largely on a credit basis, with dairymen in the area being the principal debtors-customers. Approximately 80% of his sales volume were credit transactions. As a part of his business, plaintiff also maintained storage facilities for the storage of corn, grain, and other commodities for his customers and the public. Due to the nature of their dairying operations, the credit customers would, for the most part, merely make partial payments and thus have running accounts of charges and credits extending over many months. Only a few of his customers were on a 30-day

basis and settled their accounts at the end of the month.

Plaintiff's system of record keeping was to maintain daily reports which showed for each business day the gross amount of charge sales, cash sales, payments received on accounts, bank deposits and miscellaneous expense paid from petty cash. Also, each credit sale was recorded upon an invoice or white ticket. These daily tickets, insofar as concerns the accounts receivable, were regularly machine-posted to ledger sheets, which disclosed a comprehensive statement of each individual customer's entire account, all debits, all credits, dates of same, and account balance. The primary evidence at all times pertinent, including both before and after loss, consisted of credit sale tickets written at time of sale and maintained for individual transactions by the plaintiff and his employees.

Prior to August 1, 1965, this ticket system was in duplicate. One copy of the ticket was given the credit customer at time of sale and the other copy, known as white ticket, was retained by plaintiff. The partial payment on account by a customer was not written up on a ticket but the amount of the credit was posted directly to the customer's ledger sheet.

On or about August 1, 1965, which was approximately ninety days prior to the date of the robbery here involved, plaintiff converted to a triplicate system with tickets of three colors to cover each credit transaction. When a credit sale or a credit collection was made, plaintiff or his employees wrote up a triplicate ticket. A white copy of the ticket was retained by plaintiff and kept in his office safe with his ledger accounts; a pink copy was given to the customer or payor; and a yellow copy of the ticket was also retained by plaintiff in business files apart from his safe. In this manner plaintiff maintained his accounts receivable records. When a customer for whom he stored bulk corn, grain or other commodity sold him such corn or grain, his account was credited accordingly. Those transactions prior to August 1, 1965, were only entered and shown on the ledger sheets. After that date, such commodity transactions or credits were recorded on the standard write-up credit memorandum tickets, there being three copies, white, pink and yellow, as stated.

On February 27, 1964, plaintiff secured an insurance policy insuring him at all times pertinent to this loss against certain perils specified in the policy, the principal subject of the insurance being all sums due the plaintiff from his customers, provided plaintiff was unable to effect collection thereof as a direct result of loss or damage to records of accounts receivable. That policy was in force on November 2, 1965.

That night plaintiff's place of business, including his office, was burglarized and his safe was physically carted off into the woods. At that time his safe contained therein his accounts receivable ledger and all his white tickets. Yellow tickets, not in the safe, were unmolested. The morning following the burglary and robbery plaintiff discovered the loss, learned his safe was missing, and he reported the matter to the county sheriff and to Robinson Insurance Agency, defendant's issuing agent. The individual in the insurance agency to whom he reported the loss was David Stewart, a member of the firm.

The whereabouts of the stolen safe was located. Plaintiff went to the site and viewed the remains of his records, finding that the accounts receivable ledger, save for a few surviving sheets, had been destroyed by fire. Only the ashes remained. He found his white tickets in disarray and disorder. Apparently the felons had burned some white tickets and scattered others in an effort to find cash or currency. The surviving white tickets were by no means complete or left in any state of order. Plaintiff's commodity ledger, material to this case, was also burned beyond recognition except for a metal binder. Such records as survived the casualty were gathered by plaintiff, and, with the aid of his bookkeeper, Mrs. Fuller, he put them in a semblance of order. Plaintiff, as best he could, arranged the remaining white tickets according to

the customers' names. He placed these in a box along with other remaining evidence and they were later exhibited to defendant's representatives. Also available in his office were the yellow tickets showing all of the credit transactions occurring from August 1, 1965, until the robbery. The persons guilty of this crime were apprehended, prosecuted and convicted.

In accordance with instructions from defendant, David Stewart, the local agent, at once notified General Adjustment Bureau at Meridian, Mississippi, to investigate the loss. Approximately two days after the robbery, Jay Jackson, an employee of General Adjustment Bureau, came to Louisville and, in company with Stewart, was introduced to plaintiff. Plaintiff explained to him what had happened and the state of his records. Plaintiff asked the adjuster's advice as to whether he should write customers explaining his plight and asking for their assistance as to balances owed, or whether he should advertise in the newspaper, or what course he should follow. Jackson instructed him not to contact his customers by letter, or to advertise the situation, but to take no action. Jackson further stated that defendant had a formula by which to compute losses when records of accounts receivable are missing, that he would obtain the formula and provide it to plaintiff for his guidance. This instruction was repeated by the adjuster in a subsequent conference. Throughout the course of Jackson's ensuing investigations this advice was not withdrawn.

Jackson also concluded that in order to make progress defendant should employ and send in an auditor to check the surviving records. George R. Ray, Certified Public Accountant, of Meridian, Mississippi, was so employed, and he first arrived at plaintiff's office on November 23, 1965, approximately 19 days after the loss. Mr. Ray brought with him a staff of assistants and together they examined the records, discussed with plaintiff his method of record keeping, and made other inquiry. Their investigation of his records was of a cursory nature, but they were aware of the surviving white tickets, and also of the existence of the yellow tickets.

Mr. Ray made no suggestions to plaintiff as to a course to follow. Plaintiff meanwhile, still waiting on directions from the defendant, took no concerted action to determine the exact status of his balances with his various credit customers. He followed a policy of accepting the payments by customers when they were voluntarily brought or sent to him, and of discussing informally with some customers the plight that he was in and seeking their cooperation. In every instance he accepted as correct what a customer advised him to be the balance owing, and he also accepted as correct the statement of a customer who stated he owed no balance at all. Although plaintiff had in his employ a public accountant, Mr. McCool, he did not direct McCool to attempt to reestablish his records, nor did he make such request of his office bookkeeper, Mrs. Fuller.

At no time was there any doubt that the insurance policy was in effect and afforded coverage to plaintiff in accordance with its terms; the only question was to arrive at some method for determining the amount of the loss based on the surviving records. But at no time did defendant through its adjuster, auditor, or other representatives, advise plaintiff that he should pursue the matter with each customer concerning whom he had any sort of record, undertake special collection efforts, or otherwise, through negotiation or discussion, attempt to confirm and reestablish his accounts receivable.

Matters remained at a stalemate insofar as the adjusting of the loss was concerned until mid-January 1966. Real effort by defendant toward determining the loss through normal channels was then discontinued when plaintiff demanded the approximate sum of $37,000.00 as his loss, less the actual collections made to that date. In February 1966, plaintiff

submitted proof of loss for $26,355.59,[1] after giving credit for actual collections then made and for certain bad debts. Plaintiff, in fact, collected a substantial percentage of the total accounts receivable owing prior to the date of the robbery. The gross sum collected amounted to $10,334.94. In addition thereto, there is an account of $2,850.00 owed by Jack Cockrell, which has been assigned to Pet Milk Company. The payment of that known account is certain; its ultimate recovery in full is conceded by plaintiff. Surviving ledger sheets showing customers' balances of $132.39 are also conceded by plaintiff.

The books and records of plaintiff disclose that the amount of his actual bad debt charge-off since 1960 has been inconsequential. This has been so, apparently because it has been to his interest not to charge off a greater, more realistic, sum for bad debts. There was no tax reason for him to do so because he had losses in other aspects of his operation, although showing a net profit from the Quality Feed Mill. He found it to his advantage not to deduct more for bad debts to enable his operating statements to show an increased net profit, and also aid his net worth position. He reckoned that better operating and net worth statements gave him better standing for cred-

it purposes at his bank and for other business reasons.

Since 1960, up to November 2, 1965, Quality Feed Mill had had gross sales of $2,030,260.72, of which $1,623,973.00 were credit sales. When analyzed, plaintiff's records revealed that the percentage increase in annual accounts receivable balances far exceeded percentage increase in annual credit sales. Old and uncollectible accounts were thus being carried forward on these records. There must, necessarily, be an amount to be deducted for bad debts from this gross volume of sales made largely on credit. The amount of deduction properly to be made varies in each business.[2] When McCool, plaintiff's auditor, prepared an operating statement for six months ending June 30, 1965, he made then what was deemed a realistic charge-off for bad debts for the six months interval. He then applied ½ of 1% of gross sales as a deduction. Since total sales were mainly credit sales (80%), ½ of 1% of gross sales is a reasonable and proper basis for deduction for plaintiff's bad debts. ½ of 1% of gross sales for the period involved, 1960 to November 2, 1965, would be $10,151.00, which is the correct and proper amount of deduction to be made for accumulated bad debts, and which sum is to be deducted from the total outstanding

---

1. In his proof, plaintiff computed his loss as follows:

| | | |
|---|---|---|
| "Accounts Receivable as per daily operating report 11/2/65 | | $37,387.44 |
| Add Charges of Sales for 11/3/65 (Previously explained) | | 700.00 |
| Deduct: | | |
| Collections for 11/3/65 | $ 350.00 | |
| Bad Debts for 1963 | 624.00 | |
| Bad Debts for 1964 | 624.00 | |
| Bad Debts for 10/12th of 1965 | 520.00 | |
| Collections on accounts from 11/3/65 through 2/1/66 | 9,613.85 | |
| Net Loss as of 2/1/66 (Computed as of 11/3/65 and adjusted to credit collections subsequent thereto up to 2/1/66) | | 26,355.59" |

---

2. Plaintiff's actual bad debt charge-offs were as follows:

| | |
|---|---|
| 1960 | $989.64 |
| 1961 | none |
| 1962 | 829.96 |
| 1963 | none |
| 1964 | none |
| 1965 (10 mo.) | none |

Plaintiff's proof of loss deducted an additional $1,768.00 for the period 1963 through November, 1965, thus making total bad debt charge-off of $3,587.61 for the period 1960 through November, 1965.

accounts receivable of $37,387.44 at date of loss.

There remains to consider what, if any, accounts can be reestablished from the surviving records. Three categories of tickets have been analyzed by defendant's auditor. The first category of white tickets may be identified as Schedule 4 of Exhibit 8, totaling $6,781.75. These are white tickets in the safe that escaped destruction, but supporting ledger sheets of all such tickets were burned, and all evidence of credits, if any, to offset or reduce these particular charges was destroyed. No known beginning point exists upon which to establish these items as true accounts receivable. Plaintiff, by having had destroyed his ledger accounts and by not knowing what were the applicable credits, and not knowing how to fit these tickets of individual transactions into what had gone ahead, was unable, by his records, to reestablish these accounts. Without material and necessary evidence to complete and reestablish these transactions due to destruction of records, he was in no position to insist his customers make payment; nor did he attempt to collect from these particular customers. He was justified in making no such attempt not only because of the condition of his own records, but also because of the contrary instructions of defendant's adjuster. But be that as it may, if he had made a prompt and diligent effort to collect, he was entirely without essential record support to reestablish a true account. He had nothing on which to go. The items in Schedule 4 are a loss due to missing records of plaintiff, and that amount shall not be deducted from the decree entered in his favor.

The second category of yellow tickets is shown in Schedule 5 of Exhibit 8, totaling $2,852.40. These deal with certain accounts receivable for August, September and October 1965, for which plaintiff had, at least to the extent of the amounts shown, the same primary evidence after the loss that he had before. That is to say, the accounts in this particular 3-month category, only to the extent shown in the list, could be established by credit charge and collection transactions for that period of time. The missing item from a true account was information (shown only on missing ledgers) whether there was a credit balance at the beginning of the period in favor of customers. From the way plaintiff kept his books there may very well have been credit balances in favor of dairymen customers resulting from sale and purchase of corn and farm commodities. Although more vigorous collection efforts might conceivably have resulted in positive results, yet because of the essential missing element at the beginning, and since the uncontradicted proof established that there were customers who had such credit balances, these are not accounts receivable reestablished by other records. We shall allow the $2,852.40 as a recoverable item of loss.

■ Respecting the next category of yellow tickets shown as Schedule 6 of Exhibit 8, totaling $1,829.66, the situation is quite different. After the loss, plaintiff still possessed an unimpaired record showing those outstanding debit balances. These yellow tickets established positively the amount of accounts receivable with such balances resulting from prior transactions appearing thereon, and they also show all later credit dealings during the ninety-day period immediately prior to loss. These tickets were exact copies of documents which had been delivered to credit customers in the ordinary, daily course of business. These entire transactions were also evidenced by pink tickets, whether it was a credit sale or payment on account, which had been delivered to customers. Plaintiff had, as to these items, all of the evidence necessary to confront, and satisfy the questions of, any customer regarding these particular accounts, and he knew that this portion of his records was complete and readily available to him. As to these accounts, he knew that he could approach a customer and demand payment. Where there could be no reasonable doubt, he had no right to delay taking action to collect. The fact is that

the customers on this list had been given, and had accepted without question, tickets which expressly showed a remaining balance from prior transactions. This amount of $1,829.66 may not be included as a recoverable loss, but must be treated as accounts reestablished by plaintiff's records.

Plaintiff incurred no collection expense in excess of normal collection cost because of missing records as a result of the robbery. Nor did he incur other expense in connection with the loss involved here except an item of interest charge. Although he was a regular borrowing customer of the local bank both before and after the loss, he found it necessary to increase his debt borrowing because of his inability to orderly operate his business. The $5,000.00 loan made by plaintiff from Claude Fair on November 20, 1965, was extraordinary financing reasonably required because of this casualty and the ensuing disarray and impairment of records and collections. This loan bore 8% interest. $400.00 for one year's interest on that loan would carry the obligation until plaintiff sold his business in October 1966, and this sum is a reasonable allowance for interest expense as defined in the insurance policy. Interest accruing on bank loans made in February 1966 is in no way related to or resulting from, the destruction or partial destruction of plaintiff's records.

## CONCLUSIONS OF LAW

### I.

This court has jurisdiction because of diversity of citizenship of the parties, and the amount in controversy exceeds $10,000.00. Mississippi law governs.

### II.

The policy sued upon was in full force and effect at the time of the robbery and covered plaintiff, as the insured, on the following subjects of insurance:

(a) All sums due the insured from customers, provided the insured is unable to effect collection thereof as the direct result of loss of or damage to the records of accounts receivable.

(b) Interest charges on any loan to offset impaired collection pending repayment of such loan made uncollectible by such loss or damage.

The court finds there was a loss of $12,839.35 sustained by plaintiff within the meaning of (a) above, and of $400.00 within the meaning of (b) above, and there was no loss under the remaining (c) and (d) insuring paragraphs.

### III.

The policy expressly provided there shall be deducted from the total amount of accounts receivable, *however established*, the amount of such accounts actually collected by the insured. This results in an initial deduction of $12,-435.04,[3] which is not really in dispute. Also to be deducted from the total accounts receivable is an amount "to allow for probable bad debts which would normally have been uncollectible by insured". Applying the test of that clear language, but otherwise unaided by precedent, the court concludes that it is not confined to actual charge-offs made by an insured on his records when it reasonably appears he has failed to act with ordinary business judgment. There is no fixed standard for calculating a proper deduction for bad debts. Here, plaintiff's auditor, who was familiar with his business operations, had, less than six months before the robbery, adopted a formula for bad debt deduction which was then acceptable to plaintiff and appears to be just and reasonable. That formula, which the court here applies, is ½ of 1% of the gross sales. Since it appears that the accounts receivable have accumulated since 1960 without proper deduction for bad debts, the sum of $10,-151.00 shall be deducted for bad debts from the total amount of the accounts receivable.

### IV.

The parties concede that surviving ledger sheets establish accounts re-

---

3. This figure includes $1,875.00 remaining on Jack Cockrell's account.

ceivable totaling $132.39, and that amount is to be deducted from the loss. However, a principal dispute in the case relates to the adequacy for reestablishing accounts receivable totaling $6,781.75, Schedule 4, $2,852.40, Schedule 5, and $1,829.36, Schedule 6, all appearing in Exhibit 8. In the absence of any standard supplied by known case law, the court holds that, to "reestablish" an account receivable within the meaning of this policy, there must survive the casualty event records adequate for the insured to give to a customer a satisfactory explanation of the debit and credit items in an account, when confronted with reasonable inquiry as to the balance claimed to be due by the insured. So tested, the accounts on the first two schedules, Schedules 4 and 5, are, at best, fragmentary and inadequate; and while the accounts listed under Schedule 5 approach more nearly a basis for making a computation, the absence of essential information as to prior credit balances which were lost with destruction of the ledgers, defeats an ability to reconstruct a true balance from the remaining yellow tickets.

Only the accounts listed in Schedule 6, which total $1,829.36, qualify as adequate records to be excluded from loss. These accounts are completely supported by yellow tickets of original entry, *where opening balances, either debit or credit, are expressly stated thereon.* These tickets having been written up in the regular course of business by plaintiff after examination of ledger sheets, and having had recorded thereon resulting balances by virtue of prior transactions, and having been submitted to and accepted by credit customers, without objection, constitute an account stated.

"An account stated may be defined, broadly, as an agreement between the parties to an account based upon prior transactions between them, with respect to the correctness of the separate items composing the account, and the balance, if any, in favor of the one or the other. * * * There is a distinction between an account stated and a settled account, in that an account stated properly exists only where accounts have been examined and the balance admitted as the true balance between the parties, without having been paid." 1 Am.Jur., pg. 272, Sec. 16, cited with approval in Hamilton v. Miller, 217 Miss. 316, 64 So.2d 147 (1953).

## V.

Defendant contends that had plaintiff adopted vigorous collection procedures, he might have appreciably reduced the loss and that he is not entitled to be reimbursed by defendant for the consequences of his own inactivity. Ordinarily the duty rests upon an insured following loss to exercise reasonable care to minimize the extent of his damage, and that rule is applicable here. 6 Appleman, Insurance Law and Practice, § 3890, 248–254. However, plaintiff's conduct is also to be judged in the light of the mistaken directions, and indeed failure to give prudent directions, by defendant and its representatives. At no time was plaintiff advised that he should adopt vigorous collection procedures and take extraordinary efforts to confirm customer balances, and that any expenses so incurred by him for so doing would be at the cost of defendant. Specifically no suggestion was ever made as to how plaintiff might get customers to confirm balances on accounts where adequate records were missing. On the contrary, defendant's adjuster definitely contributed to the course of inaction pursued by plaintiff in advising him to wait until "a formula" was furnished for determining the loss.[4] These repre-

4. Indeed, ¶ 6 of defendant's policy provides an elaborate formula, *in cases where the total amount of accounts receivable could not be accurately established,* based upon the amount thereof at the end of the same fiscal month in the year immediately preceding the year in which loss occurs, adjusted by increases or decreases in monthly total of accounts receivable to time of loss. Evidently, defendant's adjuster erroneously deemed this policy provision to be here applicable. As a

sentations excused plaintiff from becoming more active than he otherwise might have been, and defendant is in no position to complain that the payment for which it is liable under the policy may conceivably be greater than would be true if its adjuster had recommended an affirmative course of action with credit customers. We are not endowing the adjuster with authority to change or alter defendant's insurance policy, a result apparently to be condemned under Saucier v. Life & Casualty Insurance Company of Tennessee, 189 Miss. 693, 198 So. 625 (1940), but are concluding only that plaintiff's reliance upon instructions of the adjuster, who was charged with special duties in investigating the loss, was reasonable and excused him from making maximum efforts at collection from credit customers. In this case, whether due to the novel character of its coverage or otherwise, defendant, through its representative, undertook to advise plaintiff in ascertaining his loss, and it cannot fairly complain of the consequences. Finally, the inability of plaintiff to "effect collection" on the remaining accounts is directly attributable to the obscurity of his records, the very hazard insured against, and not because of failure to exert greater effort to collect items for which he had no record support.

### VI.

Plaintiff failed to establish any borrowings, and resulting interest charges, made necessary due to impaired collections of accounts receivable rendered uncollectible because of the robbery, other than a $5,000.00 loan made soon after the loss of his records. The rate of interest on that loan was agreed to be 8% per annum. At the end of one year following the loss, plaintiff sold his feed mill business. Plaintiff has failed to prove that bank loans made subsequent to date of loss vary materially from bank borrowings prior to the robbery, and

---

matter of fact, plaintiff's undestroyed records showed the total amount of accounts receivable to the very date of loss, with

except for the $5,000.00 loan, there was no material change in the financing of his business. The only interest charge allowed to plaintiff under the policy is $400.00 to cover the one year's interest on the $5,000.00 extraordinary loan.

Counsel having been directed by the court to compute the amount of recovery by plaintiff, a decree in favor of plaintiff for $13,239.35 is being concurrently entered.

---

the only problem being one of identification and statement of individual accounts composing the whole.