James McALISTER

v.

**DIRECTOR, FEDERAL EMERGENCY MANAGEMENT AGENCY.**

Civ. A. No. 79–88.

United States District Court,
D. Vermont.

June 15, 1982.

Peter Diamondstone, Brattleboro, Vt., for plaintiff.

Brian P. Cassidy, Regional Counsel, Federal Emergency Management Agency, Washington, D. C., Peter W. Hall, Asst. U. S. Atty., D. Vt., George W. F. Cook, U. S. Atty., D. Vt., Rutland, Vt., for defendant.

## FINDINGS OF FACT AND CONCLUSION

HOLDEN, Chief Judge.

The plaintiff, James McAlister, brought this action under the National Flood Insurance Act, 42 U.S.C. § 4001 *et seq.* He seeks to recover under a "Standard Flood Insurance Policy" issued under the Act and administered by the Federal Emergency Management Agency (FEMA). The plaintiff claims that in May, 1978, the Whetstone Brook, in Brattleboro, Vermont, flooded, causing a portion of a building he owned abutting the brook bank to subside into the brook. FEMA refused to pay the plaintiff's claim under the policy, contending that the damage to McAlister's property resulted from on-going erosion, and that no flood occurred in May, 1978, as the term "flood" is defined in the insurance policy. The court held a trial without a jury on March 29–31, 1982.

On first day of trial, the plaintiff, for the first time, sought to amend and/or supplement his pleadings to allege additional damages caused by flooding in May, 1979 and to seek compensatory, consequential, and punitive damages for FEMA's failure to pay the insurance claim. The court denied this motion without prejudice. After trial, the plaintiff again moved to supplement and amend his pleadings to conform to the evidence adduced at trial. This motion is granted.

The court's findings and conclusion are entered following the final submission of the parties on April 13, 1982.

## FINDINGS OF FACT

The plaintiff, James McAlister, and his wife, Mary Catherine McAlister, purchased the land and buildings located at 98 Williams Street, Brattleboro, Vermont in 1975 for $26,500. This property abuts the southern bank of the Whetstone Brook in Brattleboro. At the edge of the property the stream bank falls away at a sharp incline, forming a steep bank approximately sixteen feet high, measured from the stream bed to the top of the bank. The stream itself is approximately thirty feet wide. Part of the McAlister's property at 98 Williams Street consisted of a small cottage, which was located close to the bank of the stream. The McAlisters rented the cottage and receive an income of $160 per month in rent paid by the tenants of the cottage.

On March 16, 1977, the plaintiff was issued Standard Fire Insurance Policy No. FL64259807, which insured the cottage in the amount of $10,000 against loss by "flood," as defined in the policy. The policy defines "flood" as

A. A general and temporary condition of partial or complete inundation of normally dry land areas from:

1. The overflow of inland or tidal waters.

2. The unusual and rapid accumulation or runoff of surface waters from any source.

3. Mudslides (i.e., mudflows) which are proximately caused or precipitated by

accumulations of water on or under the ground.

B. The collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding the cyclical levels which result in flooding as defined in A–1 above.

(Exhibit 2) The term of the policy was from March 16, 1977 to March 16, 1978. The plaintiff subsequently renewed the policy for an additional one-year term, through March 16, 1979, in the increased coverage amount of $11,000, and again for additional one-year terms through March 16, 1981.

In mid-May, 1978[1] a portion of the cottage foundation collapsed and fell down the stream bank. McAlister soon after filed a timely notice and claim of loss under his flood insurance policy, describing the damage as the collapse of one wall of the cottage foundation. The defendant refused to pay the plaintiff's claim. The plaintiff filed this action in April, 1979. In 1980, the plaintiff sold the 98 Williams Street property for $41,000.

The plaintiff, his wife, and daughter (who was approximately thirteen years old in 1978) each testified at trial that the collapse of the cottage foundation was caused by a flood of the Whetstone Brook in May, 1978. They testified that the waters of the stream rose all the way up the stream bank (which the plaintiff estimated to be sixteen feet high and his daughter estimated to be more than 20 feet) to a level equal to the foundation wall of the cottage. The plaintiff's daughter testified that the flood occurred in a five-to-six hour time span, during which the stream rose from approximately three and one-half feet to over twenty feet. According to these witnesses, before the flood there was a strip of ground six to eight feet wide between the edge of the cottage and the stream bank, upon which stood a concrete patio. The flood allegedly caused this strip, the patio, and part of the cottage foundation closest to the bank to subside into the stream.

The tenants of the cottage in May, 1978, Catherine Elizabeth Mann and Rex Shelton, generally corroborated the testimony of the plaintiff and his family, although neither witness testified to observing the level of the Whetstone at the vicinity of 98 Williams Street on the day the foundation collapsed. Finally, the plaintiff offered into evidence a letter from Ruth A. Hertzberg, a neighbor of the McAlister's who apparently also owned land abutting the stream. This letter, dated September 7, 1978, states:

> To Whom It May Concern:
>
> This will explain the erosion of the Whetstone Brook abutting Mr. McAlister's property at 98 Williams Street.
>
> During early May we had days of torrential rain which forced the brook to become a raging torrent.
>
> The spring rains of 1978 did more damage, due to erosion, to both our properties than in previous years.

(Ex. 1) Miss Hertzberg did not testify at the trial.

The plaintiff and his family also testified that the cottage suffered additional damage as a result of a flood in May, 1979. Except for this testimony, however, the only evidence of this second flood is a photograph of the cottage, allegedly taken in the summer of 1979, showing loss of additional parts of the foundation. (Ex. 10) The plaintiff sought for the first time to assert the occurrence of this second flood at the onset of trial. There is no evidence that he ever presented a claim to FEMA for the 1979 loss. The plaintiff testified that in 1979 the waters of the Whetstone were not as high as those in May, 1978. His wife stated the waters were "high" in 1979, but could not be more specific. The plaintiff's daughter testified she only noticed high water in 1978.

---

1. At trial, the plaintiff testified that the 1978 flood may have occurred in April, rather than May. This statement, however, contradicts those of all the other plaintiff's witnesses, including the plaintiff's wife, daughter, and the tenants of the cottage at the time. In addition, the claim of loss filed by McAlister under the insurance policy, his complaint in this action, his signed affidavit of April 19, 1981, and his own deposition testimony state unequivocally that the loss occurred in May, 1978. (Ex. Q, P, R)

Despite the testimony and evidence presented by the plaintiff's witnesses, the clear weight of the evidence contradicts the plaintiff's claim that his loss was caused by a flood of the Whetstone Brook in May, 1978, or by a second flood in May, 1979.

The evidence establishes that the McAlisters were concerned about on-going erosion of the bank of the stream as early as 1976. The plaintiff, sometime in 1976, installed a layer of rubber tires along the stream bank, apparently to forestall erosion of the bank. In addition, McAlister spoke with representatives of the Town of Brattleboro and, in 1977, with representatives of the Vermont Agency of Environmental Conservation, Department of Water Resources about his erosion problem.[2]

In September, 1977, the plaintiff's property was visited by William Corley and other representatives of the United States Department of Agriculture's Soil Conservation Service. During an inspection of the plaintiff's property, photographs of the cottage as it stood along the Whetstone's bank were taken. These photographs show clearly that the cottage stood perilously close to the edge of the bank, and that the bank had suffered extensive erosion, resulting in exposure of the footings of the cottage's foundation. (Ex. A9, A10)

The next Spring, in April, 1978, Noah Hudson and Raymond Godfrey, both representatives of the Soil Conservation Service, visited the plaintiff's property to determine whether federal funding might be available to assist McAlister in attempting to stabilize the bank and stem the erosion. Hudson testified that he observed an on-going erosion problem, resulting in exposure of part of the cottage. He further observed that portions of the upper bank were wet and consisted of sandy topsoil and that the vegetation on the bank indicated ongoing erosion. Based on his visit, Hudson determined that due to the steepness of the bank it could not be stabilized without filling in

the bank and encroaching the stream channel 20 to 25 feet. He concluded federal funding for such a project was not available. (Ex. A12) In a letter to McAlister dated May 18, 1978, Godfrey informed McAlister of these findings.

After the plaintiff had filed his notice of loss under the insurance policy, David C. Penney, of Gordon Boyd Insurance Adjusters, Inc., was assigned to investigate the claim. Penney visited the property on June 6, 1978 and met McAlister there. Penney observed the damage to the cottage. McAlister told him at this meeting that the bank had "eroded" during May, that it "had been going for some time," and that it had been caused by surface run-off. McAlister did not mention his belief that a flood had caused the damage.

After this June meeting, Penney reviewed the insurance policy and informed the plaintiff by telephone that the policy did not cover the damage because there had been no flood. On August 24, 1978, Penney met again with McAlister at 98 Williams Street to explain why the policy did not cover McAlister's loss and to give McAlister an opportunity to show Penney where the stream had risen above normal cyclical levels, as required by the policy. McAlister told Penney that the water had been "high," but could not show where it had exceeded the normal cyclical levels.

After the August meeting, Penney investigated the claim further. The Brattleboro Town Manager's office told him there had been no flood in May, 1978. He also learned from the Soil Conservation Service that the stream bank on McAlister's property had been determined unstable. On this basis, and the plaintiff's failure to show Penney how high the water had risen, Penney denied the claim in writing. (Ex. K)

Edward Pickering, who, until January, 1982 was a captain in the Brattleboro Fire

---

2. McAlister also appears to have been in contact with United States Senator Patrick Leahy of Vermont. In a letter to the plaintiff dated August 9, 1977, Senator Leahy wrote that he had been briefed "on the severe erosion problem of your land along the Whetstone Brook," and suggested that McAlister pursue efforts to obtain funding through the Soil Conservation Service to remedy the problem. (Ex. H)

Department and Deputy Civil Defense Director for the Town of Brattleboro, testified that he was in charge of flood watches and keeping flood records for the town during 1978. According to Captain Pickering, when the Whetstone has flooded in the past, town records contain the date, time and place of the flood. He testified that there are no records of any flooding along the Whetstone in May, 1978, although there had been a flood watch and evacuation along a lower portion of the brook in April, 1978. Captain Pickering also explained that there is a flood alarm device placed under a bridge crossing the Whetstone about three-fourths of a mile upstream from the McAlister's property, which sounds an alarm at the Brattleboro police station when the Whetstone rises to twelve feet above normal.[3] This alarm was never triggered during May, 1978. Captain Pickering also stated that in his experience, having lived in Brattleboro for over 40 years, and having performed as Deputy Civil Defense Director from 1962 to 1982, the Whetstone is regularly higher in the spring than other times of the year.

Captain Pickering testified that he gave no warnings or advice to anyone relating to flooding of the Whetstone during May, 1978. In April of 1978, he had been involved in an evacuation of a trailer park located on the Whetstone, at a place where the bank of the stream is unusually shallow and where flooding problems occur often. But, according to Captain Pickering, even when the stream has overflowed in the vicinity of the trailer park or the place where the flood warning device is located, there has never been a problem in the area of the McAlister property along Williams Street.

Gordon E. Smith, a captain in the Brattleboro Police Department, testified that the flood warning device is connected directly with the police station, and if the monitor is activated, it sounds an alarm "like a foghorn" in the station, at which time the dispatcher on duty, in the regular course of his business, records the time of the sounding. Captain Smith explained that the alarm is activated when the water rises to approximately seven feet. (Ex. Z) The monitor was installed in August, 1977. According to Captain Smith, the Brattleboro Police Department daily logs for May, 1978, 1979, 1980, and 1981 show that the alarm was activated once on May 25, 1979 and once on May 8, 1980, but never in May, 1978. The police log and Captain Smith's testimony establish that the brook was checked at the location of the alarm monitor very soon after the alarm sounded on May 25, 1979. The water level was reported as four feet, one inch; there were no flood related problems. (Ex. A5) Captain Smith also testified that the alarm is periodically tested and that it works.

The testimony of Morris Root, a civil engineer from Springfield, Vermont, establishes that the official National Oceanic and Atmospheric Administration (NOAA) climatological records show that 2.95 inches of rain fell in Vernon, Vermont, which is adjacent to Brattleboro, for the entire month of May, 1978. (Ex. O) Almost 4 inches fell during that month in Wardsboro, Vermont and 3.65 inches in Readsboro, Vermont, both located in the southeastern part of the state. The last trace of snow was reported in Peru, Vermont on May 8, 1978.

Mr. Root specializes in water resources and flood-related investigations. He is engaged, with his employer, Dufresne, Henry, Inc., in an ongoing flood insurance study of the Whetstone for the Town of Brattleboro and is familiar with the Whetstone and various floodplain studies of this stream. Based on his knowledge of the stream and its banks, and the NOAA climatological data for May, 1978, Root offered his opinion that even if 4 inches of rain fell in a single day, the Whetstone would reach a level of seven to ten feet, an occurrence which could be expected about once every ten years. If, as the NOAA records indicate, a maximum of only 1.7 inches fell in any single day in

---

**3.** Captain Gordon Smith, of the Brattleboro Police Department, testified that the flood alarm sounds when the water reaches seven feet. Exhibit Z, a photograph of the flood alarm device, confirms that it is seven, not twelve feet, that activates the alarm. (See also Ex. A5)

the region (see Ex. O), there would have been high water of a level occurring frequently throughout the year, but not a flood. A level of more than seven feet would cause flooding.

Mr. Root testified that, based on the topography of the area, it would be extremely unlikely for a flood to occur downstream from the flood alarm device if there were not flooding at the location of the monitor. Finally, it was Mr. Root's opinion that a flood resulting in 16 feet of water at the area of 98 Williams Street would occur only once every 500 years.

Based on the testimony and exhibits, the court finds that a preponderance of the evidence establishes that portions of the plaintiff's cottage, located at 98 Williams Street, Brattleboro, Vermont, subsided down the bank and into the Whetstone Brook sometime in May, 1978. During May, 1978, the Whetstone did not rise to a level approaching the foundation of the cottage, which stands on a bank approximately sixteen feet above the stream bed. Nor did a flood condition occur at the plaintiff's property in May, 1979. Although the Whetstone may have been "high" at times during May, 1978 and May, 1979, it did not rise to levels exceeding normal anticipated cyclical levels, nor did it cause a flood condition in the vicinity of the plaintiff's cottage.

The plaintiff's cottage and adjacent property suffered damage from gradual, ongoing erosion of the stream bank, which had been occurring at least since 1976. As early as September, 1977, the stream bank had eroded to the point of exposing the foundation of the plaintiff's cottage. The damage sustained by the plaintiff in May, 1978 was caused by this condition of ongoing erosion. Any further damage in May, 1979, was similarly the result of erosion, not flooding.

## CONCLUSION

The flood insurance policy under which the plaintiff seeks to recover does not provide coverage for the type of loss sustained by the plaintiff. "Flood" is defined in the policy to include one of two conditions: either a "general and temporary condition of partial or complete inundation of normally dry land areas," which the plaintiff does not claim occurred, or "[t]he collapse or subsidence of land along the shore of a . . . body of water as a result of erosion or undermining caused by waves or currents of water exceeding the cyclical levels . . . ." In addition, the policy expressly excludes losses caused "[b]y theft or by fire, windstorm, explosion, earthquake, landslide or any other earth movement except such mudslide or erosion as is covered under the peril of flood." (Ex. 2)

The evidence shows that the Whetstone Brook did not rise beyond its normal cyclical levels in May, 1978. Moreover, the plaintiff's loss was caused by gradual erosion of the bank over a period of years. This loss is not within the definition of "flood." Rather, the loss suffered by the plaintiff falls squarely within the express exclusion of losses caused by mere erosion. On this basis, the court concludes that the plaintiff cannot recover under the policy for his property loss. *See Winkler v. Great Am. Ins. Co.,* 447 F.Supp. 135 (E.D.N.Y. 1978). The defendant is not liable to the plaintiff.

Accordingly, the Clerk shall enter judgment for the defendant. It is so OR-DERED.