Argued October 11, 1971, affirmed March 1, petition for
rehearing denied April 19, 1972

# HATLEY, *Respondent, v.* TRUCK INSURANCE EXCHANGE, *Appellant.*

494 P2d 426
495 P2d 1196

*James H. Clarke,* Portland, argued the cause for appellant. With him on the briefs were McColloch, Dezendorf, Spears & Lubersky and George L. Kirklin.

*Gerald R. Pullen,* Portland, argued the cause for respondent. With him on the brief was James A. Luebke.

McALLISTER, J.

This is an action on the Vandalism and Malicious Mischief Endorsement of a policy of property insurance. Plaintiff had a verdict and judgment below and defendant insurer appeals.

Plaintiff operates a carpet and drapery store in downtown Milwaukie. His store building sits back

about twenty feet from the curb with grass and shrubs planted in the area between the curb and the building. In warm weather plaintiff watered this area during the day, using soaker hoses attached to an outside faucet. As the ground sloped downward from the curb to the building, plaintiff placed the soaker hoses near the curb. On June 25, 1968, the water had been on all day. There was evidence that when plaintiff left the store at about 6:30 p.m. he turned the water off. When he came to work the next morning, he found that the hose had been moved close to the building and the water turned on full force. Water was striking the front of the building with the spray going as high as the eaves. Inside the building the floor, which is below ground level in the front, was covered with water and water was running out under the doors. Rolls of carpet which were stored on the floor had been soaked and damaged.

The jury awarded plaintiff the full amount of his claim for damage to his carpets plus the amount he expended having them cleaned and dried. Defendant contends that the trial court committed errors which require a reversal or new trial.

The defendant first contends that this action was not brought within the time limited by the policy, which provides:

"No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within 12 months next after inception of the loss."

The loss occurred on June 25 or 26, 1968. On June 3, 1969, plaintiff filed an action on the policy in the

federal district court, which was dismissed on July 25, 1969, for lack of diversity jurisdiction. The present action was filed on August 1, 1969. It will be noted that the federal district court action was filed within the 12-month period limited by the policy and was dismissed for lack of jurisdiction after the policy limitation had expired. The present action is not a continuation of the federal court action, but a new action, and obviously was not commenced within the 12-month period provided by the policy.

Plaintiff relies entirely on our "saving" statute, ORS 12.220:

"* * * if an action is commenced within the time prescribed therefor and the action is dismissed upon the trial thereof, or upon appeal, after the time limited for bringing a new action, the plaintiff, * * * may commence a new action upon such cause of action within one year after the dismissal or reversal on appeal; * * *."

Defendant contends that the above statute is not applicable for several reasons. Defendant first argues that ORS 12.220 does not apply when the applicable limitation period is specified by contract rather than by statute. The authorities are divided on this question. See 16 ALR3d 452. ORS 12.220 refers to the "time prescribed" and the "time limited" for bringing an action, without referring specifically to the source of the prescription or limitation. However, we do not have to decide in this case whether ORS 12.220 applies to contract limitation periods generally.

■ The 12-month limitation provision contained in defendant's policy is one of the provisions of the standard fire insurance policy which is required by statute. ORS 743.660. In *Bell v. Quaker City F. & M.*

*Ins. Co.,* 230 Or 615, 370 P2d 219 (1962) we considered a similar provision, required by a prior statute, which was in all material respects identical with the provision under consideration here. We held that the policy limitation provision was governed by ORS 12.020 and 12.030, defining the time of commencement of a suit or action within the meaning of the statutes of limitation. It is clear from the opinion in that case that we regarded the policy limitation period, as required by statute, to be a statute of limitation:

> "\* \* \* The legislature, in the exercise of its power to regulate the business of insurance has, by the enactment of ORS 744.100, prescribed certain provisions which shall be included in every contract of fire insurance, among them the 12-months' limitation period for bringing an action on such a contract. It has limited an insurance company's right to contract, but it has not undertaken either to create a right or provide a remedy. If no special statute of limitations had been prescribed, the case would be governed by ORS 12.080, which fixes a six-year limitation for bringing an action on a contract. \* \* \* In effect, the legislature has amended ORS 12.080 and the case is no different than if the limitation with respect to insurance contracts had been added to that section by way of exception or proviso." 230 Or at 619-620.

That reasoning covers the present case as well. The statute requires the limitation period to be included in the policy. It is, in effect, a statutory limitation period, and is governed by ORS 12.220, which allows the plaintiff additional time in which to file a new action in certain cases, just as it is governed by the companion provisions of ORS 12.020 and 12.030 which define the commencement of an action.

■ Defendant next questions whether the statute

applies when the original action is dismissed for lack of jurisdiction. The courts have generally held that where the original action fails because the court in which it is brought lacks jurisdiction the action has, nevertheless, been commenced within the meaning of the saving statute. In the leading case of *Gaines v. City of New York*, 215 NY 533, 109 NE 594 (1915), Justice Cardozo said:

> "* * * The statute is designed to insure to the diligent suitor the right to a hearing in court till he reaches judgment on the merits. Its broad and liberal purpose is not to be frittered away by any narrow construction. The important consideration is that, by invoking judicial aid, a litigant gives timely notice to his adversary of a present purpose to maintain his rights before the courts. When that has been done, a mistaken belief that the court has jurisdiction stands on the same plane as any other mistake of law. Questions of jurisdiction are often obscure and intricate. * * * There is nothing in the reason of the rule that calls for a distinction between the consequences of error in respect of the jurisdiction of the court and the consequences of any other error in respect of a suitor's rights." 109 NE at 596.

The cases appear to be in agreement that an action brought in federal court and dismissed for lack of diversity jurisdiction is an action within the meaning of the applicable saving statute. *Roth v. Northern Assurance Company*, 32 Ill 2d 40, 203 NE2d 415, 16 ALR3d 442 (1964); *Swiontek v. Greenstein*, 33 Ill App 2d 355, 179 NE2d 427 (1961); *Wasyk v. Trent*, 174 Ohio St 525, 191 NE2d 58 (1963); *Pittsburg, C., C. & St. L. Ry. Co. v. Bemis*, 64 Ohio St 26, 59 NE 745 (1901); *Green v. Prince*, 53 Tenn App 541, 385 SW2d 127 (1964). See, also, *Ockerman v. Wise*, 274 SW2d 385 (Ky 1954); 6 ALR3d 1043, 1058-1060. We agree with

the holdings of these cases, and hold that an action brought in a federal court is "commenced" within the meaning of ORS 12.220, even though that court finds itself without jurisdiction because of lack of diversity of citizenship.

Defendant next argues that ORS 12.220 does not authorize the filing of a second action where the first action has been dismissed before trial. Defendant relies on the requirement of the statute that the first action be "dismissed upon the trial thereof", and cites a number of cases which we think do not apply to the facts of this case.[1] We think this case is controlled by ORS 17.025, which provides that "a trial is the judicial examination of the issues between the parties, whether they be issues of law or of fact." The original action was dismissed after the legal issue of whether diversity jurisdiction existed was tried and determined adversely to plaintiff.

■ ORS 12.220 was a part of Oregon's original code of civil procedure. It originally provided:

"If an action shall be commenced within the time

---

[1] Fuller v. Safeway Stores, 258 Or 131, 481 P2d 616 (1971); Hardy v. Janssen, 252 Or 608, 451 P2d 486 (1969); Pakos v. Warner, 250 Or 203, 441 P2d 593 (1968); Haworth v. Ruckman, 249 Or 28, 436 P2d 733 (1968); Warn v. Brooks-Scanlon, Inc., 256 FS 690 (DC Or 1966). Defendant's reliance on these cases is misplaced. There is a distinct policy reason for denying the benefit of the statute to a plaintiff who has by inaction allowed his claim to be dismissed for want of prosecution, and the cases dealing with this situation are clearly distinguishable. In the cases involving voluntary nonsuits, the beginning of the trial on the merits was held to be a crucial time not because of the provisions of ORS 12.220, but because of our interpretation of the nonsuit statute. For our present purposes, the important distinction in those cases is not whether the trial on the merits had begun, but whether the court had been called upon to exercise its judicial function. Dismissal of an action for lack of jurisdiction is a judgment of the court which requires a determination of questions of law or fact or both.

prescribed therefor, and a judgment therein for the plaintiff be reversed on appeal, the plaintiff * * * may commence a new action within one year after the reversal." Deady and Lane, General Laws of Oregón 1843-1872, § 21.

In 1921 this statute was amended to extend its coverage to cases dismissed "upon the trial thereof" as well as to those reversed on appeal. The purpose of the amendment is obvious—to extend the benefits of the statute to plaintiffs whose cases are terminated adversely at the trial level, as well as to plaintiffs whose favorable judgments are reversed on appeal. In *White v. Pacific Tel. & Tel. Co.*, 168 Or 371, 376, 123 P2d 193 (1942) we described the effect of the statute as follows:

"* * * We, therefore, hold that, under this statute, where the plaintiff fails otherwise than upon the merits and the time limited for the commencement of such action has expired, the plaintiff may commence a new action within one year as provided by the statute and that it has no application to a judgment entered after trial upon the merits and that the word 'dismissed,' as used in section 1-219, O.C.L.A. [ORS 12.220], signifies a final ending of an action, not a final judgment on the controversy, but an ending of that particular proceeding. * * *"

See, also, *Wolfe Investments v. Shroyer*, 249 Or 23, 25, 436 P2d 554 (1968). We have held that a dismissal for want of prosecution and a nonsuit granted a plaintiff as a matter of right are not dismissals within the meaning of the statute as amended. We have not, however, held that only a dismissal after the beginning of the trial on the facts comes within its terms. Such a construction would be wholly at odds with the purpose of the statute, which is to avoid the bar of the statute of limitations for a diligent plaintiff whose timely

action has been dismissed over his objection without a determination on the merits. It would also be inconsistent with the statutory definition of trial, found in ORS 17.025, quoted above.

■■ We hold, then, that the words "upon the trial" in ORS 12.220 include the trial of questions of law as well as of fact, as provided in ORS 17.025. We further hold that a dismissal for want of jurisdiction of the cause, whether requiring a determination of issues of law alone or of issues of both law and fact, is a dismissal within the meaning of ORS 12.220. Such a dismissal is the judgment of the court which terminates the case other than on the merits.

The next question is whether the loss was within the coverage afforded by the policy. The vandalism endorsement under which plaintiff claims coverage provides:

"1. In consideration of the premium for this coverage, and subject to the provisions of this policy and the Extended Coverage Endorsement attached thereto, the coverage under said Extended Coverage Endorsement is extended to include direct loss by Vandalism and Malicious Mischief.

"2. * * * THE TERMS 'VANDALISM' AND 'MALICIOUS MISCHIEF' AS USED IN THIS ENDORSEMENT MEAN ONLY WILLFUL AND MALICIOUS DAMAGE TO OR DESTRUCTION OF THE PROPERTY COVERED HEREUNDER."

Defendant moved for a directed verdict on the ground that there was no evidence to support a finding of vandalism or malicious mischief. The denial of that motion is assigned as error.

Defendant argues that there is no evidence that

the water was turned on the building with an intent to damage plaintiff's property, and that such an intent is necessary under the policy definition of vandalism and malicious mischief.

There was evidence that when plaintiff left his place of business on the evening of June 25 the water was off and the hose lying near the curb about twenty feet from the building. Some time during the night or early morning, unknown persons not only turned on the water full force, but also moved the hose near the building. The front of the building consists largely of display windows which extend from just above ground level to just under the eaves.

■■ The jury could unquestionably find from this evidence that the hose was moved and the water turned on deliberately. The problem is whether the jury could find that this deliberate act, which resulted in extensive damage to plaintiff's property, constituted "willful or malicious physical injury." "Willful" and "malicious" have been variously defined according to the context in which they have been used, and we find it unnecessary to review the various definitions. We think property has been damaged "willfully and maliciously" if the damage results from an intentional act from which damage manifestly would or could result.

The parties have cited a number of cases dealing with the coverage of vandalism and malicious mischief coverage in property insurance policies. In some of those cases the policy left the terms "vandalism" and "malicious mischief" undefined. In others the policy contained a definition substantially similar to that in defendant's policy endorsement. The cases are collected

at 23 ALR3d 1259. We will discuss only those which we find pertinent to the question before us.

In *Rich v. United Mut. Fire Ins. Co.*, 328 Mass 133, 102 NE2d 431 (1951) the issue was whether the loss was caused by vandalism. The policy did not define the term; the court held that it

"* * * refers to such wanton and malicious acts as are intended to damage or destroy the property insured." 102 NE2d at 432.

Plaintiff in that case had left his car parked on a hill, headed downhill, with the front wheels turned in and the emergency brake on. Some time later the car was found at the bottom of the hill where it had crashed into a tree. The brake was still on. The court held that plaintiff had not proved the damage was caused by vandalism:

"* * * It could be found that the automobile had been caused to move from its position by reason of human intervention. But there was no greater probability that the force which caused the automobile to move was applied intentionally by a thief or vandal than, for example, by some negligent act of the operator of another automobile or the act of a child in play. The evidence leaves the cause of the impulse to the automobile a matter of speculation, conjecture, and surmise." 102 NE2d at 432.

Defendant places considerable reliance on this case, but we find it distinguishable. As pointed out above, the jury was entitled to find from the evidence before it in this case that the hose had been moved and the water turned on deliberately. Although there was some evidence to the contrary, the jury could find without resorting to speculation that negligence played no part in plaintiff's loss. In *Rich,* on the other hand, there

was no evidence from which it could be determined that the car was caused to move by a deliberate act.

We think this case is more like *Lanza Enterprises, Inc. v. Continental Insurance Co.*, 142 S2d 580 (La App 1962), in which a faucet was turned on at a construction site during the weekend when no one was working. The faucet was connected to a hose which led inside the building under construction. The water ran for some time and did considerable damage. There was no evidence to show who had turned the faucet on, or why. The court held the damage was covered under a policy insuring against vandalism and malicious mischief, defined as in the policy we are considering. The court said:

> "The uncontradicted evidence, accepted as correct by the trial court, excluded any negligence of the job-employees as the cause of the damages. On the other hand, the person or persons who were sufficiently skilled to get over or under the high fence and into the construction premises, must have intended damage to the building by turning on the water full force into the hose leading into it, so as to permit the water's unrestricted flow while the premises were deserted over the weekend. It took a deliberate act to turn on the faucet, and under such circumstances the deliberately turning and leaving the water on full force (which would obviously cause damage), evidenced the deliberate intention to damage the building." 142 S2d at 582.

It is true that directing water against the outside of a building is not as certain to cause serious damage as directly flooding the inside. Nevertheless, it is obvious that some damage to the grounds or the building would probably result if they were subjected to the full spray from the hose placed near the building at the bottom of the sloping area and left running for a protracted

period. The likelihood of some damage was great enough to bring the case within the policy coverage.

We turn next to the contention that plaintiff's damage was specifically excluded from coverage. The vandalism and malicious mischief endorsement provides that its coverage is "subject to the provisions of this policy." The main policy provides, under the heading "Exclusions":

"This policy does not insure against:
\* \* \* \* \*

"C. Loss caused by, resulting from, contributed to or aggravated by any of the following:
\* \* \* \* \*

"2. flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not;
\* \* \* \* \*

"4. water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through sidewalks, driveways, foundations, walls, basement or other floors, or through doors, windows or any other openings in such sidewalks, driveways, foundations, walls or floors;
\* \* \* ."

Defendant contends that the water which caused plaintiff's damage entered the building either as "surface water," within subparagraph 2, or as "water below the surface of the ground" within subparagraph 4.

■ It is not clear from the evidence just how the water entered the building. However, we think that is immaterial, as it is undisputed that the damage occurred because the hose was moved and the water turned on. We have held that the jury could find this

was an act of vandalism or malicious mischief. The vandalism and malicious mischief endorsement was added to the policy to give coverage for damage caused by just such acts. Where the act of vandalism or malicious mischief consists of turning water against the building, and where there is water damage as a direct and immediate result of that act, the general policy exclusion for certain types of water damage does not apply. Under the circumstances we hold it is irrelevant whether the water was above, on, or under the surface of the ground when it entered the building. To hold otherwise would be to import into the vandalism coverage distinctions which have no reasonable purpose in that context.

The final question is whether the trial court permitted plaintiff to recover damages which were, excessive as a matter of law. The complaint alleged property damage in the amount of $17,500 and expenses in the amount of $1,100 to clean and dry plaintiff's carpets. The jury awarded the total amount claimed.

9. The evidence was that the market value of the carpets immediately prior to water damage was $45,000, and their value immediately after the damage was $25,000. Plaintiff's evidence, therefore, was that the water damaged the carpets in excess of the $17,500 claimed. He also testified that he paid $700 to rug cleaning firms to have some of the carpets dried, and $400 in wages and truck rental for loading and hauling these carpets and for work done in spreading others out to dry on the premises. The trial court instructed the jury on damages as follows:

"In this instance you would take from the evidence what was the reasonable market value of the rugs that were damaged immediately before the

incident and what was the reasonable market value of the rugs immediately after the accident.

"Now the plaintiff does have a duty to mitigate damages, and the testimony would indicate that he expended $1100 to dry out the rugs and so forth, and if you find that there was this damage and that he did mitigate it and this was reasonable, you could also include what you find was reasonable in mitigating the damage to those rugs, that is, as to the fair market value."

Defendant took no exception to these instructions. It did, however, request the following instruction, which was not given:

"I instruct you that under the terms of the policy plaintiff may not recover for the cost of repairing or replacing any property damaged."

Defendant assigns as error the trial court's failure to give this instruction, and the court's refusal to remove the $1100 item from the jury's consideration.[2] It is argued that plaintiff was allowed a double recovery, because he recovered both the loss of value of his carpets and expenses incurred in restoring part of that value. If that had been what happened, there would indeed have been a double recovery. However, under the trial court's instructions, plaintiff was permitted to recover the expense items only if the jury found they were reasonably expended in mitigation of damage. By mitigation, we understand the trial court

[2] There was no formal motion to withdraw this item of damages from the jury. The trial judge himself raised the question of double recovery under the allegations of the complaint. Plaintiff's counsel argued the matter and convinced the court that the expense items should be submitted on a theory of mitigation of damages. After the court had ruled, defendant's counsel stated "I was going to move against that." Under these circumstances, we treat the problem of double recovery as properly saved in the trial court, even though it was never made the subject of a motion by defendant.

622

to mean minimization of damage or avoidance of further damage, and we believe the jury would have so understood the instruction. There was no direct evidence that the drying operations increased the market value of the carpets over the value which plaintiff testified they had immediately after the water damage. There is, however, evidence from which the jury could have found that having the carpets dried was necessary to prevent further damage. Plaintiff testified that carpets which mildewed had to be thrown away and were not salvaged. He also testified that water moved through the carpets according to what he called a "wicking" effect; that is, that the water seeped through the carpets beyond the area of direct contact with the water, carrying dirt with it, and that the dirt caused stains. The jury could have found that it was reasonable to expend money to have the carpets dried to prevent additional damage from mildew and water stains. Under the instructions given by the trial court, we cannot hold as a matter of law that plaintiff was awarded double damages.

As defendant makes no argument concerning the policy coverage for expenses for the purposes of minimizing damage, we do not consider that question.

Having held all of defendant's assignments of error to be without merit, we hold that the judgment of the trial court is affirmed.

## ON PETITION FOR REHEARING

Argued October 11, 1971, affirmed March 1, petition for rehearing denied April 19, 1972

McALLISTER, J.

In our opinion we recognized that the coverage afforded by the vandalism and malicious mischief endorsement was "subject to the provisions of this policy." We then quoted verbatim the provisions of

the exclusions① which defendant contended, and still contends, expressly exclude the damage to plaintiff's carpet from coverage under the policy.

We agree that the water loss exclusions, if applicable, would limit the coverage of the vandalism endorsement. We simply intended to hold that the water loss exclusions were not intended to apply to water intentionally and maliciously sprayed against plaintiff's carpet store.

The term "surface water," particularly when used in conjunction with flood, waves, and tidal water, was intended to mean water "diffused over the surface of the ground, derived from falling rains or melting snows." *Price v. Oregon Railroad Co.*, 47 Or 350, 358, 83 P. 843 (1906). We have been cited to no cases either in the field of property insurance or that of water law in which water from any but a natural source is held to be surface water.② In the context in which the term is used in defendant's policy we hold that its meaning is so limited.

Likewise, we think the exclusion of "water below the surface of the ground" was intended to have the general meaning of "subterranean waters," whether percolating waters or underground streams.③

---

① There is no extended coverage endorsement attached to the policy and the exclusions were taken from the policy itself, Section 1, paragraph V.

② "The term 'surface water' is used in the law of waters in reference to a distinct form or class of water which is generally defined as that which is derived from falling rain or melting snow, or which rises to the surface in springs, and is diffused over the surface of the ground, while it remains in such diffused state or condition. * * *" 56 Am Jur 547, Waters § 65.

③ "Subterranean waters are usually divided into two principal classes, namely: (1) underground bodies or streams of water

Defendant argues, in effect, that since all water must be either on the surface or below the surface of the ground the water exclusions should be interpreted so broadly as to exclude all damage by water. Obviously the defendant did not intend to exclude all water damage or it would have said so, either in the policy itself or in the vandalism endorsement. We note that the vandalism endorsement does specifically exclude all damage to glass. If the defendant had intended to exclude all water damage it could have said so with equal simplicity.

We adhere to our holding that the water exclusions of the policy were not intended to apply to the malicious spraying of water against plaintiff's building and the damage to its merchandise resulting directly therefrom. Water sprayed against the building was neither surface nor underground water. The petition for rehearing is denied.

---

flowing in known and defined or ascertainable channels or courses, and (2) waters which ooze, seep, or percolate through the earth, or which flow in unknown or undefined channels, generally referred to as 'percolating waters.' * * *" 56 Am Jur 585, Waters § 102.