**REAL ASSET MANAGEMENT, INC., Plaintiff–Appellee/Cross–Appellant,**

v.

**LLOYD'S OF LONDON, et al., Defendants–Appellants/Cross–Appellees.**

No. 94–40790.

United States Court of Appeals, Fifth Circuit.

Aug. 24, 1995.

---

David E. Walle, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, LA, for appellants.

Edmond L. Guidry, III, Guidry & Guidry, Martinville, LA, for appellee.

Before WOOD,[*] JOLLY and DeMOSS, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge:

Real Asset Management, Inc. filed suit against Lloyd's of London and Unionamerica Insurance Co. alleging failure to pay benefits due under an insurance policy for damages sustained to a building as a result of Hurricane Andrew. Lloyd's of London removed to federal court on the grounds of diversity. The district court found in favor of the plaintiff and awarded the policy limits, penalties and attorney's fees. Lloyd's of London appeals the district court's ruling that the insured property was a total loss, that the plaintiff is entitled to the limits of the policy, that the plaintiff did not fail in its obligation to mitigate losses, that the district court failed to reasonably depreciate the building's value, and that the defendants were arbitrary and capricious in their failure to tender benefits. Real Asset Management, Inc. cross-appeals the amount of damages.

## I.

On July 29, 1992, Real Asset Management, Inc. [Real Asset] purchased a three-story brick building [Davis building] located in New Iberia, Louisiana, from First Acadiana National Bank of Opelousas, Louisiana, for $75,000.00. The building had formally been the Davis Furniture showroom and warehouse. It was purchased sight unseen by Real Asset, a Utah corporation, through Tommy Hebert, the seller's agent. Hebert

* Circuit Judge of the Seventh Circuit, sitting by designation.

was subsequently hired by the plaintiff to manage and develop the building.

Shortly after the purchase, Hebert bought property damage insurance coverage from defendants with a policy limit of $160,000.00. Hebert had requested coverage based on the lower actual purchase price, but the insurers refused due to the coinsurance provision of the policy.[1] The policy limit was based on an appraisal made by David Hebert (no relation to Tommy Hebert), agent of The Insurance Center and Michael St. Germaine, an insurance broker of Rodco Worldwide. The actual cash value of the building was in part determined according to its square footage, which was 16,000 square feet. The policy limit was then set at 80 percent of the derived cash value. According to David Hebert, the actual cash value of the building on August 6, 1992, was $200,000.00. Therefore, the insurance company set the policy limit on the building at $160,000.00.

On August 26, 1992, Hurricane Andrew caused great destruction along the Gulf Coast, including the New Iberia area. The Davis building suffered significant damage. In early September, Real Asset filed a claim for the damage to the building in accordance with the terms of the insurance policy underwritten by defendants, Lloyd's and Unionamerica Insurance Company.

Custard Insurance Adjusters [CIA] was assigned to inspect the building. Harris Kenley, a claims adjuster, investigated the building soon after the storm and estimated damages at $12,631.56, not including the $2,500.00 deductible. Unsatisfied with the damage estimate, Hebert called the CIA office and requested another estimate. Between September and November 1992, the building was inspected several times by experts on both sides of this dispute. It was

found that the storm caused the greatest amount of damage to the building's roof. Although at the time of the initial claim Kenley's testimony established that the roof could have been repaired for approximately $12,000.00, the defendants refused to tender any amount. Because both parties were disputing the extent of damages caused by the storm, neither party took any immediate preventative measures. The building was therefore left to deteriorate from September until late December when a temporary roof was installed.

In January 1993, Real Asset filed suit against the defendant insurers. By a letter dated May 3, 1993, the defendants proposed a settlement and a release of liability for $35,000.00. The plaintiff rejected the offer.

In a bench trial, the district court granted judgment in favor of the plaintiff for the policy limits of $160,000.00, $100,000.00 in penalties, and 20 percent of the total judgment in attorney's fees. The defendants filed a timely motion for a new trial. In a written memorandum, the court denied the motion. The court held that the actual cash value of the building prior to the storm was $160,000.00. Further, based on evidence of the replacement cost less depreciation, the court found the damage sustained was at least $160,000.00. Because the cost to repair was more than the building's value, the building was considered a total loss. The court also assessed penalties and attorney's fees under La.R.S. § 22:1220 based on the defendants' bad faith conduct in withholding benefits.[2] This appeal followed.

## II.

 We review a district court's findings of fact under the clearly erroneous stan-

---

1. The coinsurance clause in relevant part provides:

 This Company shall not be liable for a greater proportion of any loss to the property covered than the amount of insurance under this policy for such property bears to the amount produced by multiplying the actual cash value of such property at the time of the loss by the coinsurance percentage applicable (specified on the first page of this policy, or by endorsement). [The applicable percentage specified on the first page of the policy was 80 percent].

Many property insurers use coinsurance clauses, especially in connection with coverage for commercial buildings, to encourage insurance purchasers to acquire coverage that is close or equal to the full value of the property. *See generally*, Robert E. Keeton & Alan I. Widiss, Insurance Law 20 (1988).

2. Section 22:1220 is discussed in detail in Section V. of this opinion.

dard. *Peavey Co. v. M/V ANPA,* 971 F.2d 1168, 1174 (5th Cir.1992). A finding is clearly erroneous when although there is evidence to support it, the reviewing court is left with a definite and firm conviction a mistake has been committed. *Williams v. Reading & Bates Drilling Co.,* 750 F.2d 487, 489 (5th Cir.1985) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). A trial court's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review unless clearly erroneous. *United States v. Ornelas–Rodriguez,* 12 F.3d 1339, 1346 (5th Cir.1994); *United States v. Raymer,* 876 F.2d 383, 386 (5th Cir.), *cert. denied,* 493 U.S. 870, 110 S.Ct. 198, 107 L.Ed.2d 152 (1989).

### III.

■ The defendants argue that the district court erred when it found from the evidence that the building was a total loss because there was no evidence to support that finding. The plaintiff contends the district court was correct because the evidence established that the cost to repair the building greatly exceeded its pre-hurricane value.

### A. Condition of the Building Prior to the Hurricane

The district court found the building had an actual cash value of approximately $160,-000.00 before the hurricane. The finding was based on the testimony of David Hebert, the insurance agent, and Michael St. Germaine, the insurance broker, who agreed that the actual cash value assigned to the building

by the insurer was $160,000.00. This figure was assigned even though Tommy Hebert had requested the limits be set only at the actual purchase price, $75,000.00, which the insurers refused because of the coinsurance provision. Subsequent to the loss, the insurance company's adjuster, Wayne Ward, stated in his preliminary report that the value of the building was $160,636.00.[3] The district court also considered the testimony of Patrick Caffery, a disinterested witness who had inspected the building for the First Acadiana National Bank in February 1992, and again just days before the sale to Real Asset. He testified that at the time of his second inspection there was no substantial change in the building's condition. Caffery's replacement value estimate[4] was consistent with the testimony of Glenn Wilson, a certified M.A.I. appraiser. Wilson testified that the actual cash value of the building before the storm was $181,440.00.[5] The district court concluded that the testimony established that the building's value was consistent with what the building had been insured for, and although the building had suffered some deterioration before the storm, it was not in the dilapidated condition defendants claimed.

■ Part of the difficulty is that neither the insured, insured's agent nor the insurer inspected the building before Hurricane Andrew. In our review of the record we find that the district court was correct in finding that the actual cash value of the building prior to the storm was commensurate with the insurance company's own valuation. The policy at issue[6] is an

3. Ward reported that the replacement cost of the property was $321,272.00, subject to 50 percent depreciation, which brought the actual cash value of the property to $160,636.00.

4. Caffery determined that the replacement value was $569,000.00, less a 90 percent depreciation. The district court found Caffery's replacement cost was credible, but did not rely on his depreciation figure.

5. Wilson's figure was based on a replacement cost of $601,470.00, less 70 percent for depreciation.

6. The pertinent part of the policy provides:
IN CONSIDERATION OF THE PROVISIONS AND STIPULATIONS HEREIN OR ADDED

HERETO AND OF the premium specified, this Company, for the term of years specified from inception date shown At Noon (Standard Time) to expiration date shown at Noon (Standard Time) at location of property involved, to an amount not exceeding the amount(s) specified, does insure the insured named and legal representatives, *to the extent of the actual cash value of the property at the time of the loss, but not exceeding the amount it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss,* without allowance for any increased cost of repair or reconstruction by reason of any ordinance or law regulating construction or repair, and without compensation for loss resulting from interruption of business or manufacture, nor in any event for more than the

"actual cash value"[7] policy. Under this type of policy, the premium paid is based on the value assigned by the insurer. The defendants argue that allowing the plaintiffs to recover the policy limits gives them a windfall when they paid less than half that as the purchase price a month before the storm. However, as the defendants testified, they would not accept it as the value of the property for insurance purposes. Under Louisiana Valued Policy Law, if the insurer bases the premium on its valuation of the property, then in the event of a total loss, the insurer shall pay the actual cash value, or in other words, the policy amount.[8] La.R.S. § 22:695(A). The value that is determinative is the value placed on the property by the insurance company. Moreover, it was the insurance company's own formulation that ultimately set the policy amount.

■ The testimony of several experts established that the value of the building prior to the storm was consistent with the insurance company's assessment of the property. The defendants contend that the court relied on the testimony of Glenn Wilson, but ignored the testimony of other experts who had inspected the building prior to the storm, namely Patrick Caffery and Gordon James. On appeal, however, an appellate court gives much deference to the district court's assessment of the credibility of witnesses. *United States v. Bass*, 10 F.3d 256, 258 (5th Cir. 1993). A finding of fact in that regard will not be overturned unless manifest error appears in the record. *Id.* The district court found Mr. Caffery to be "extremely credible", and only discredited his depreciation figures.[9] Gordon James had also previously appraised the property for the Bank of Iberia[10] every year from 1987 to 1991, but the district court did not find his testimony reliable. James stated he had a recollection of the problems, but did not detail those problems in his reports to the bank. We accept the determination by the district court that the testimony of M.A.I. appraiser Glenn Wilson and Patrick Caffery was credible and that the testimony of Gordon James was not as reliable. Although Wilson did not inspect the building prior to the storm, his calculation was still very close to the insurance company's own valuation. Further, Wayne Ward, an adjuster for the insurance company, stated in his preliminary report subsequent to the loss, that the building had an actual cash value of $160,636.00. The record supports the finding of the district court.

## B. Condition of the Building After the Hurricane

The building's roof suffered the most hurricane damage. Again, the defendants argue the court credited and discredited the wrong testimony. The record reveals that Wayne Labiche, a civil engineering consultant, found

interest of the insured, against all DIRECT LOSS BY FIRE, LIGHTNING AND BY REMOVAL FROM PREMISES ENDANGERED BY THE PERILS INSURED AGAINST IN THIS POLICY, EXCEPT AS HEREINAFTER PROVIDED, to the property described herein while located or contained as described in this policy, or pro rata for five days at each proper place to which any of the property shall necessarily be removed for preservation from the perils insured against in this policy, but not elsewhere.

7. "Actual cash value" is defined as the reproduction cost less depreciation. *See e.g., Mamou Farm Serv. v. Hudson Ins. Co.*, 488 So.2d 259, 263 (La.Ct.App. 3d Cir.1986).

8. La.R.S. § 22:695(A) provides:
A. Under any fire insurance policy insuring inanimate, immovable property in this state, *if the insurer places a valuation upon the covered property and uses such valuation for purposes of determining the premium charge to be made*

*under the policy, in the case of total loss the insurer shall compute and indemnify or compensate any covered loss of, or damage to, such property which occurs during the term of the policy at such valuation without deduction or offset, unless a different method is to be used in the computation of loss, in which latter case, the policy, and any application therefor, shall set forth in type of equal size, the actual method of such loss computation by the insurer.*
(Emphasis added).

9. The district court found Caffery's depreciation figures were inconsistent with other appraisal testimony and believed that in this regard Caffery had an interest in reporting to the bank a higher amount of depreciation.

10. It should be noted that First Acadiana National Bank, the bank Real Asset purchased the Davis building from, acquired the property through a merger with the Bank of Iberia.

the cost to repair prior to the hurricane would have been $5000.00. He explained that he found two leaks in the roof and credited some interior water damage to those leaks. Labiche, however, testified that after that the roof membrane had blown off during the storm. Charles Ivey, an expert for the defense, testified that none of the damage to the building was caused by the storm and that the roof's membrane was missing prior to the hurricane. Labiche, in contradiction, testified that if the roof had been damaged prior to the storm as Ivey testified, there would have been an extensive and obvious decay of lumber in the interior of the building which there was now. Further, Robert Billeaud, an estimator for J.B. Mouton & Sons, also opined that the damage was relatively recent or there would have been more decay. The district court discredited Ivey's testimony because it was shown to be completely inconsistent with the testimony of Patrick Caffery, who inspected the building just days before the sale to Real Asset and found that the roof membrane was there. Richard Morgan, the roofing estimator who later installed the temporary roof, also testified that the roof's membrane had blown off during the storm. He explained that the roof decking had not rotted through and there was no roofing membrane which had dropped through the holes in the roof.

■ There is substantial evidence to support the district court's finding that the damage caused by the storm and subsequent deterioration was in excess of the policy limits. When the cost to repair exceeds the value of the property, the property is considered a total loss. *See Dumond v. Mobile Ins. Co.*, 309 So.2d 776, 778 (La.Ct.App. 3d Cir.1975); *Bennett v. Emmco Ins. Co.*, 215 So.2d 518 (La.Ct.App. 4th Cir.1968). The testimony established that the actual cash value of the building prior to the hurricane was in a range of $160,000.00 to $180,441.00. To replace the building before depreciation it was estimated it would cost in the range from $221,730.00 to $601,470.00. We cannot say that the district court's finding that the building was a total loss was clearly erroneous.

■ Although the evidence supports the district court's finding that the building was a total loss, we find that the court failed to consider the extent of the damage caused by the plaintiff's own failure to mitigate losses. The building was damaged not only by the storm but also by the subsequent deterioration it suffered as a result of being left open to the weather without a roof for four months. If a building escalates into a total loss due in part to the plaintiff's own failure to mitigate, the plaintiff is not entitled to receive the full value of the loss under the policy limits. The loss shall be reduced by the extent of damage attributable to the plaintiff because of failure to mitigate damages and prevent further decay of the building. The district court noted in its memorandum denying a new trial: "[D]espite the recommendation of their own adjuster, the roof was not repaired and no money was tendered to the insured for repair to the roof. The building quickly deteriorated into a total loss from complete interior exposure to rain, humidity and sun." The district court found mitigation was not a substantial issue because the plaintiff's duty to mitigate terminated when the insurer received the recommendation from their adjuster that $12,000.00 (less the deductible) should have been tendered. We find, however, no legal support for the proposition that an insured's duty to mitigate terminates when the insurer breaches his duty to timely settle a claim.[11]

11. The district court terminated the plaintiff's duty to mitigate when it found that the insurer had an obligation to pay. Even though the insurer may have been in breach at this point, this breach or the availability of coverage in no way excused the insured from a duty to take action to avoid further injury. The duty to mitigate is such a recognized defense in the recovery of damages that some courts have awarded insureds the expenses of mitigating when an insured has taken protective measures. *See e.g., Harper v. Pelican Trucking Co.*, 176 So.2d 767, 772–774 (La.Ct. App. 2d Cir.1965); *Slay Warehousing Co. v. Reliance Ins. Co.*, 471 F.2d 1364, 1367–68 (8th Cir. 1973); *Winkler v. Great Am. Ins. Co.*, 447 F.Supp. 135, 142 (E.D.N.Y.1978); *Hatley v. Truck Ins. Exch.*, 261 Or. 606, 494 P.2d 426, 433 (1972); *see also Toledo Peoria & W. Ry. v. Metro Waste Sys., Inc.*, 59 F.3d 637 (7th Cir.1995) (finding that insured was entitled to expenses of mitigation and the diminished value of the property although it "would have been more economical to have scrapped the damaged property at the

Under Louisiana law it is clear a plaintiff has a duty to do what it can to mitigate losses. *See Eaves v. Norwel,* 570 So.2d 123, 129 (La.Ct.App. 3d Cir.1990); *Kuck v. City of New Orleans,* 531 So.2d 1142, 1144 (La.Ct. App. 4th Cir.1988); *Crawler Supply Co. v. Bituminous Casualty Corp.,* 391 So.2d 1223 (La.Ct.App. 1st Cir.1980); *Van Rossum v. St. Paul Mercury Ins. Co.,* 147 So.2d 100 (La.Ct.App. 2d Cir.1962). The purpose of the duty is for the insured to preserve the property when the property is not a total loss and reasonable efforts would maintain its condition and value. *Crawler,* 391 So.2d at 1226. Further, La.Code Civ.Ann. art. 2002 provides that an obligee must make "reasonable efforts" to mitigate damage caused by the obligor's failure to perform.

■■■■■ The record reveals the Real Asset notified the insurers of the loss on August 31, 1992, a few days after the hurricane. The insurers responded within a few days and sent CIA adjuster Harris Kenley to evaluate the damage. Approximately two weeks later Dave Costa, another adjuster for CIA, contacted Tommy Hebert and notified Hebert that he would be in charge of the claim. During this phone call, Hebert asked for a temporary roof, but Costa replied he did not have the authority to initiate such a measure. In a follow up letter Costa recommended that Hebert take all necessary measures to protect the building while authorization was pending. Hebert did not. On November 13, 1992, two and a half months after the hurricane and a month and a half since Hebert requested a temporary roof, the insurers authorized the installment of a temporary roof. Up to this point neither the insured nor the insurer had taken any action to physically protect the building from further damage. On December 24, 1992, the temporary roof was installed. Throughout the course of attempting to ascertain the extent of damages, it appears the plaintiff did not make any reasonable efforts to protect the building from further deterioration. For instance, it may have been reasonable under the circumstances for the plaintiff to at least have temporarily, and without great expense, put a tarp over the damaged roof. These possible

efforts were not explored in the record. The district court correctly found that the evidence supported the finding that the building was a total loss. We find, however, that the plaintiff had a duty to mitigate losses and prevent unnecessary subsequent damage. The extent of damages that can be shown to have been caused by the plaintiff's failure to mitigate should reduce the damages accordingly. The issue of damages recoverable under the policy will be remanded for that purpose. The defendant bears the clear burden to show what extent of damages should be mitigated. *Perrette v. City of Slidell,* 465 So.2d 63 (La.Ct.App. 1st Cir.1985); *Reeves v. Travelers Ins. Co.,* 329 So.2d 876 (La.Ct.App. 2d Cir.1976).

## IV.

■■■ The defendants next contend that the district court did not factor in reasonable depreciation when it considered the cost of repair. In its denial of the defendants' motion for a new trial, the district court recognized the defendants' contention, but explained that depreciation had been factored into the determination of the building's value. The court reiterated that the policy involved was an actual cash value policy, which requires ascertaining the value of the loss by determining the building's replacement value less depreciation. The defendants maintain that the depreciation figure the court used was not reasonable because it did not reflect the neglected condition of the building prior to the hurricane.

■■■ Under an "actual cash value policy", the insured is entitled to recover the actual cash value (reproduction cost less depreciation) of the property in the event of a total loss. The district court recognized that the building was old and slightly deteriorated before the hurricane, but had been receiving basic maintenance. Testimony establishing the building's replacement cost and depreciation was presented by several witnesses on both sides of the dispute. A report subsequent to the storm by the insurer's adjuster found that after a 50 percent depreciation, the value of the building was $160,636.00.

outset rather than to have attempted repairing it").

Moreover, it was only twenty days prior to the storm that the insurance company valued the property at $200,000.00. Patrick Caffery and Glenn Wilson, both experienced appraisers, were comparable in their assessments of the building's replacement value as well. Wilson estimated a cash value of $180,441.00, using a replacement cost of $601,470.00 and 70 percent for depreciation. Caffery opined that the building's value was $569,000.00, but used a 90 percent depreciation figure. Here the court discredited Caffery's depreciation figure for several reasons. First, the court found that because Caffery was making the inspection for a bank, he may have had an interest in reporting a higher rate of depreciation. Second, Caffery's own report and photographs did not support a 90 percent depreciation rate. The district court found that the only significant damages reported prior to the storm were two small holes in the building's roof. Other testimony supported this finding, but minimized the actual damage. Wayne Labiche testified that prior to the hurricane the roof could have been repaired for $5000.00. Further, even after the storm, the insurer's own adjuster estimated that the roof could have been repaired for approximately $12,000.00.

As we have previously indicated, the record does not support the defendants' allegation that the building was in an extensive state of neglect prior to the storm. Therefore, the reproduction cost was reasonably depreciated by the district court in obtaining the actual cash value of the building.

## V.

■ The defendants also appeal the district court's award of penalties and attorney's fees under La.R.S. § 22:1220. The district court found that the defendants breached their affirmative duty of good faith under La.R.S. § 22:1220 in withholding the appropriate insurance benefits, and therefore awarded $100,000.00 in penalties along with 20 percent of the total judgment as attorney's fees. The court determined that the defendants had an obligation to tender $12,631.56, less the $2500.00 deductible, when the insurance company's adjuster provided satisfactory proof of loss. The district court stated:

> A series of communications between the adjusting company and the underwriters makes it clear that the defendants were well aware that there was legitimate damage to the insured property directly and unequivocally resulting from the storm winds. Despite the clear evidence that this was a legitimate claim, they chose to take an adversarial stance with their insured. As a result of the baseless position, the building deteriorated into a dilapidated condition. Once the building was virtually destroyed by the weather, the insurers took the position that this was a preexisting condition and attempted to prove such. All of this was done despite the insurance company's own documents indicating that the actual cash value of the property prior to the hurricane was $200,000.
>
> . . . . .
>
> The callous manner in which this claim was treated by the defendants led to the finding of arbitrary and capricious failure to pay the insurance claim. All reliable evidence indicates the Davis building was water tight before the storm ... The investigation of the claim was unreasonably delayed and ultimately denied as defendants sought to avoid the duty owed by them under the policy.

*Real Asset Management, Inc. v. Lloyd's of London, et al.*, No. 93–0289 (W.D.La. July 14, 1994) (order denying motion for a new trial).

■ "Whether or not an insurer's failure or refusal to pay is arbitrary, capricious or without probable cause within the meaning of the statute is a question of fact to be determined in light of the facts and circumstances." *Smith v. State Farm Fire & Casualty Co.*, 695 F.2d 202, 205 (5th Cir.1983). The assessment of penalties is likewise a factual determination. *Cotton Bros. Baking v. Industrial Risk Ins.*, 941 F.2d 380, 387 (5th Cir.1991). We will not disturb the district court's award of penalties and attorney's fees in the absence of manifest error. *Hidalgo v. Old Hickory Ins. Co.*, 630 So.2d 252, 255 (La.Ct.App. 5th Cir.1993); *Meshell v. Insurance Co. of N. Am.*, 416 So.2d 1383, 1389 (La.Ct.App. 3d Cir.1982).

La.R.S. § 22:1220(A) legislatively imposes a duty of good faith and fair dealing on "insurers."[12] *Midland Risk Ins. Co. v. State Farm Mut. Auto Ins. Co.*, 643 So.2d 242, 244 (La.Ct.App.3d Cir.1994). Section (B) enumerates certain acts, which if knowingly committed by an insurer, would constitute a breach of that duty. *Id.* To summarize, the statute in relevant part provides:

> (A) An insurer ... owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
>
> (B) Any one of the following acts ... constitutes a breach of the insurer's duties:
>
> . . . . .
>
> 5) Failing to pay the amount of any claim due ... within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
>
> (C) In addition to any general or special damages ... the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.

La.R.S. § 22:1220.

■ Whether an insurer's refusal to pay a claim is arbitrary, capricious, or without probable cause, warranting the imposition of statutory penalties and attorney's fees depends on the facts known to the insurer at the time of its action.[13] *Romero v. Gary*, 619 So.2d 1244, 1247 (La.Ct.App. 3d Cir.1993). The defendants were promptly made aware of the condition of the building after the storm and had legitimate proof of the loss from their own adjuster. Despite this knowledge, the defendants did not tender any benefits and unreasonably delayed the authorization to install a temporary roof. Further, by the time the temporary roof was installed, it had been approximately four months from the date of the storm. We find, regardless of the plaintiff's failure to mitigate, the defendants were required to initially tender benefits, but affirmatively delayed doing this with the knowledge that it was a legitimate claim and that the property would further deteriorate, the defendants breached their duty of good faith under La.R.S. § 22:1220(B)(5).

### VI.

■ Next, we review whether the penalty award was appropriate considering the finding that the defendants breached their duty of good faith under La.R.S. § 22:1220. Because we have previously determined that the damages awarded should be reduced to reflect the plaintiff's failure to mitigate, the statutory penalties awarded also need to be reconsidered so that award can be based on the new damage amount. We will, however, address the issues the plaintiff raised in regard to the penalties. The plaintiff contends that the penalty award and attorney's fees

---

**12.** Under the statute, an "insurer" includes "every person engaged in the business of making contracts or insurance, other than a fraternal benefit society. A reciprocal, an interinsurance exchange or a Lloyds organization is an 'insurer.'" La.R.S. § 22:5(2).

**13.** The defendants first contended that they did not have an obligation to initially pay out any benefits because they have continuously maintained that the building was a total loss before the storm. Under Louisiana law, an insurer will be found to have acted in bad faith for refusing to tender an undisputed amount of the claim. *See Ken Brady Ford, Inc. v. Roshto*, 607 So.2d 1062, 1065 (La.Ct.App. 3d Cir.1992) (holding that where there is reasonable disagreement between the insured and insurer as to the amount of the loss, an insurer must unconditionally tender the part of the claim for which there is no dispute); *see also Sibley v. Insured Lloyd's*, 442 So.2d 627, 632 (La.Ct.App. 1st Cir.1983). The defendants therefore argue that the obligation to tender any benefits has always been in dispute. As the district court found, however, this argument is baseless. The building was already found not to be in the condition the defendants alleged. Moreover, it was the defendants' own determination that the building had a cash value of $200,000.00 just *before* the hurricane. The record evidences that there was substantial damage to the New Iberia area, including damage to a neighboring building whose roof also suffered tremendous storm damage. We agree with the district court that the defendants' claim that they did not have an obligation because the building was a total loss before the storm has no merit.

should be increased to include the demolition costs and a 33 percent attorney fee arrangement. The district court denied both increases. As to the demolition costs, the court held that those damages were not provided for in the statute.

 The plaintiff contends that demolition costs are allowed under § 22:1220 because the building was a total loss as a direct consequence of the defendants' delayed handling of the claim. Although the building may be in such an extreme state of disrepair, we need not determine whether such costs are provided for in the statute because there is insufficient evidence in the record to suggest that the building's demolition is necessary. Further, the plaintiff's failure to mitigate to some degree contributed to the building's demise. The plaintiff's expert, Robert Billeaud, testified about the relevant costs required in demolishing the building, but there was no other evidence to suggest that an immediate removal was required. The record is devoid of any findings that the building is now a nuisance or otherwise in violation of a city code. The penalty award should not include the cost of demolition. Statutory penalties are in order but need to be reevaluated when the district court reconsiders the damage award under the policy.

 The plaintiff also requests that the attorney's fees award be increased to cover the ⅓ contractual arrangement. Although the district court awarded attorney's fees, these penal damages are not specifically recoverable under La.R.S. § 22:1220. *Massachusetts Indem. & Life Ins. Co. v. Humphreys*, 644 So.2d 818, 821 & n. 5 (La.Ct.App. 1st Cir.1994); *Chevron Chem. Co. v. Factory Compressor Parts, Inc.*, CIV.A. No. 93–160, 1993 WL 475482 at *1 (E.D.La. November 8, 1993); *Estate of Robichaux v. Jackson Nat'l Life Ins.*, 821 F.Supp. 429, 432 (E.D.La.1993). The general rule is that attorney's fees may be recovered as an item of damages where specifically authorized by statute or contract. *Nat Harrison Assoc., Inc. v. Gulf States Util. Co.*, 491 F.2d 578, 588–89 (5th Cir.1974). The district court awarded attorney's fees under a general theory of recovery. *See Maryland Casualty Co. v. Dixie Ins. Co.*, 622 So.2d 698, 703 (La.Ct.App. 1st Cir.1993). In *Maryland*, the court held that an award of attorney's fees is appropriate where an insurer is guilty of bad faith and the insured has to employ an attorney to protect his interests. *Id.* Although this general principle of law may provide for such an award, we find that attorney's fees are specifically recoverable in this case as an item of penalty damages under § 22:658.[14] Sections 22:658 and 22:1220 are both penal statutes and similar in that each statute provides for penalty awards when an insurer has arbitrarily, capriciously or without probable cause failed to timely settle a claim. The primary difference between the two sections is that § 22:1220 provides for an insured or claimant, or both to sue for breach of the duties under the statute, whereas § 22:658 only allows an insured to sue for breach. *Harris v. Fontenot*, 606 So.2d 72, 74 (La.Ct.App. 3d Cir.1992); *see also* W. Shelby McKenzie & H. Alston Johnson, *Developments in the Law, 1989–1990— INSURANCE*, 51 La.L.Rev. 249, 253 (1990). Because this is an action between an insured and insurer, both statutes are applicable.[15] Real Asset initially requested damages only

14. The relevant portion of § 22:658 provides:

*Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor, as provided in R.S. 22:658(A)(1), or within thirty days after written agreement or settlement as provided in R.S. 22:658(A)(2) when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty,* in addition to the amount of the loss, of ten percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or any of said employees, *together with all reasonable attorneys fees* for the prosecution and collection of such a loss, or in the event a partial payment or tender has been made, ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees for the prosecution and collection of such amount. La.R.S. § 22:658(B)(1).

15. Enacted in 1990, § 22:1220 imposes a good faith duty on insurers to settle claims sixty days after satisfactory proof of loss. La.R.S. § 22:1220(B)(5). Section 22:658 also allows an insured to sue an insurer when the insurer fails in certain duties, including failure to pay a legitimate claim thirty days after proof of loss. La. R.S. § 22:658(B)(1).

under § 22:658, but later amended its complaint to include § 22:1220. Because the plaintiff requested damages under both statutes and has shown that the defendants' conduct was arbitrary, capricious and without probable cause in the timely settling of the claim, a penalty award may also be assessed under § 22:658. Because the defendants have already been assessed a penalty award under § 22:1220, an award we find appropriate in light of their conduct, it is only necessary to award reasonable attorney's fees under § 22:658. The district court here found 20 percent of the total judgment was reasonable, and we accept the district court's assessment of this award. Although we find the award of penalties and attorney's fees proper under a different analysis, the district court's award of penal damages was not manifestly erroneous.

FOR THE FOREGOING REASONS, we AFFIRM the decision of the district court in part, but REMAND the issue of damages so the district court may reconsider the award in accordance with this opinion.